IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 04–cv–01746–EWN

RUBEN V. GONZALES,

    Plaintiff,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

    Defendant.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

    This is a social security benefits appeal under 42 U.S.C. § 405(g) (2005). Plaintiff challenges the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits. Jurisdiction is based on 42 U.S.C. § 405(g).

**FACTS**

*1.  Medical Evidence*

    Plaintiff was born on March 14, 1948, and was fifty-five years old on the date of the Administrative Law Judge's ("ALJ") decision. (Admin. R. at 14 [filed Nov. 4, 2004] [hereinafter "Admin. R."].) Plaintiff has an eighth grade education, and did not attend high school or college. (*Id.* at 14, 234, 267–68.) Plaintiff has worked in the vocationally relevant past as a municipal

maintenance worker. (*Id.* at 14, 49, 75, 269–70.) He alleges that he became disabled on November 7, 2000 due to vision and hearing loss and injuries to his left shoulder and arm. (*Id.* at 34, 52.) Plaintiff stopped working on February 27, 2001 on the advice of his doctors. (*Id.* at 14, 52, 61.)

On November 8, 2000, Richard Book, D.O. treated Plaintiff for work-related injuries to his left shoulder and arm. (*Id.* at 149.) Dr. Book found tenderness to palpation and decreased range of motion in lifting Plaintiff's hand above his head. (*Id.* at 149.) Dr. Book placed Plaintiff's arm in a sling, and treated Plaintiff with anti-inflammatory medication, muscle relaxants, and analgesic medication. (*Id.*) On November 10, 2000, Dr. Book recommended physical therapy and restricted Plaintiff to lifting, pushing, and pulling no more than forty pounds. (*Id.* at 46, 148.)

In December 2000, radiology reports on Plaintiff's left shoulder showed results consistent with early degenerative changes of the acromioclavicular joint. (*Id.* at 222.) Dr. Book continued to limit Plaintiff to lifting, pulling and pushing no more than forty pounds. (*Id.* at 146.)

In January 2001, magnetic resonance imaging ("MRI") scan of Plaintiff's left shoulder indicated chronic degenerative changes with an old partial tear to the supraspinatus tendon. (*Id.* at 221.) Dr. Book extended his recommended limitations, restricting Plaintiff to lifting no more than forty pounds, and prohibiting Plaintiff from jack hammering, working above Plaintiff's head, and making repetitive movements more than ten times per hour. (*Id.* at 144, 145.) Dr. Book also referred Plaintiff to orthopedist David Weinstein, M.D. (*Id.*) Dr. Weinstein diagnosed Plaintiff

with a partial rotator cuff tear with surrounding tendinitis, and a biceps tendon rupture.[1] (*Id.* at 92–93.) Dr. Weinstein recommended home exercises, a cortisone injection, and surgery in the form of an arthroscopic subacromial decompression with rotator cuff repair. (*Id.* at 93.)

In February 2001, Dr. Weinstein's physical examination of Plaintiff revealed no obvious atrophy or deformity of Plaintiff's left shoulder, tenderness of anterior subacromial space with positive impingement sign, weakness with external rotation/abduction testing, a good range of motion, no underlying instability, and evidence of a proximal rupture with distal retraction of the biceps tendon. (*Id.* at 84.) On February 27, 2001, Plaintiff underwent arthroscopic surgery to repair the rotator cuff tear in his left shoulder. (*Id.* at 86–87.)

From March 2001 through May 2001, Plaintiff received follow-up treatment from Drs. Book and Weinstein and continued with physical therapy. (*Id.* at 134–40, 176–216.) In March 2001, Dr. Weinstein examined Plaintiff, and noted that Plaintiff was progressing, working in physical therapy regularly, and experiencing decreased pain. (*Id.* at 140.) Dr. Weinstein recommended that Plaintiff continue physical therapy and avoid repetitive activity and overhead lifting. (*Id.*) In April 2001, Dr. Book examined Plaintiff, recommended that Plaintiff continue taking anti-inflammatory medication, and prescribed analgesic medications. (*Id.* at 138–39.) On May 11, 2001, Dr. Weinstein reported that Plaintiff had been overusing his shoulder, and recommended that Plaintiff limit repetitive and overhead activity and re-institute physical therapy. (*Id.* at 137.) On May 14, 2001, Drs. Book and Weinstein discussed and implemented

---

[1]The rotator cuff is a structure consisting of muscle and tendon fibers at the upper half of the shoulder join. The tendons and muscles in the rotator cuff include the supraspinatus, infraspinatus, teres minor, and subscapularis. 5-R Attorneys' Dictionary of Medicine 3913 (Matthew Bender & Co., Inc. 2004).

restrictions on Plaintiff's left upper extremity including a weight lifting limitation of no more than twenty pounds, no continuous or repetitive motion, and no work above the shoulder. (*Id.* at 134, 135, 136.)

In June 2001, Dr. Weinstein found that Plaintiff's portals had completely healed and Plaintiff had an excellent passive range of motion with active elevation to 165 degrees. (*Id.* at 90, 133.) Dr. Weinstein recommended that Plaintiff continue with a home exercise program, and released Plaintiff back to work with restrictions including a weight lifting restriction of no more than twenty-five pounds. (*Id.* at 133.) Dr. Book found that Plaintiff had a decreased range of motion and tenderness to palpation in the left shoulder, and recommended that Plaintiff observe Dr. Weinstein's work restrictions. (*Id.* at 130–32.) Also in June 2001, Plaintiff underwent an audiometric evaluation, which indicated that Plaintiff needed hearing aids for both ears. (*Id.* at 95–96.)

In July 2001, Gary Hess, M.D. found that Plaintiff had a limited range of motion of the cervical spine and left shoulder and tenderness on the left side of the cervical spine, in the trapezius musculature, over the acromioclavicular joint, and over the rotator cuff and biceps tendons. (*Id.* at 104, 109-10.) Dr. Hess found that X-rays and MRI scans were consistent with a complete tear of the rotator cuff and demonstrated bone spurring and degenerative changes in the cervical spine. (*Id.* at 110, 219–20.) Dr. Hess advised Plaintiff to return to physical therapy and to refrain from working at his job and other heavy work activities. (*Id.* at 108, 109–10.) Dr. Book also examined Plaintiff in July 2001, and found decreased range of motion in Plaintiff's left upper extremity, and tenderness and slight swelling at the base of Plaintiff's left neck area. (*Id.* at

128.) Dr. Book found that Plaintiff could hear a soft-spoken word from ten feet away. (*Id.*) Dr. Book advised Plaintiff to refrain from working at his job. (*Id.* at 127, 128, 129.)

In July 2001 and August 2001, MRI scans revealed that Plaintiff had generalized degenerative disc disease and degenerative joint disease of the lower cervical spine, a full thickness partial tear of the rotator cuff, and a complete tear of the biceps tendon. (*Id.* at 217–19.) On August 28, 2001, Dr. Hess examined Plaintiff and noted that an MRI scan of Plaintiff's cervical spine demonstrated significant spinal stenosis with multiple disc protrusions, and diagnosed Plaintiff with a probable rotator cuff tear and apparent cervical radiculopathy into the left arm. (*Id.* at 107.)[2]

In September 2001, Dr. Book noted that Plaintiff's shoulder was improving and physical therapy was helping. (*Id.* at 123.) Dr. Book recommended that Plaintiff continue to refrain from working, including performing light duties at home. (*Id.*)

In December 2001, Dr. Book reported that Plaintiff was exercising by walking, hunting, and shooting. (*Id.* at 121, 122.) Dr. Book cautioned Plaintiff regarding the effect of the recoil of the shotgun on Plaintiff's shoulder. (*Id.*)

In January 2002, Dr. Hess recommended surgical rotator cuff repair to improve strength and relieve pain in Plaintiff's left shoulder. (*Id.* at 107.) Dr. Hess noted that Plaintiff had previous evidence of a rotator cuff tear and a biceps tendon rupture, deformity in the biceps muscle, and tenderness and crepitus in the left shoulder. (*Id.*)

---

[2]Radiculopathy is any disease or abnormality of a dorsal or ventral spinal nerve root from the point where it merges with the spinal cord to the point where it joins its companion root to form a spinal nerve. 5-R Attorneys' Dictionary of Medicine 218 (Matthew Bender & Co., Inc. 2004).

In February 2002, Dr. Hess performed surgery on Plaintiff's left shoulder to repair the ruptured rotator cuff and biceps tendon. (*Id.* at 99–102.) Dr. Hess also performed a partial acromionectomy and distal clavicle excision. (*Id.*) Plaintiff subsequently returned to physical therapy. (*Id.* at 105.)

On April 8, 2002, Dr. Book opined that Plaintiff could lift zero pounds, could perform no repetitive activity with his left upper extremity, and could perform no work. (*Id.* at 119.) From April 2002 through December 2002, Plaintiff received treatment from Donald A. Johnston, M.D. (*Id.* at 240–63.) Dr. Johnston found that Plaintiff was depressed. (*Id.*)

On March 25, 2003, Dr. Johnston opined that Plaintiff had severe depression secondary to a medical condition, which caused extreme limitations in activities of daily living and social functioning; frequent difficulties with completing tasks in a timely manner due to problems with concentration, persistence, or pace; and continual episodes of deterioration and decompensation in work settings. (*Id.* at 226–28.)

In March 2003, Daniel Olson, M.D. performed an independent medical examination of Plaintiff for the Division of Worker's Compensation. (*Id.* at 232–39.) Dr. Olson found that Plaintiff experienced soreness and limited motion in his left shoulder; experienced depression, primarily in the area of social functioning; did not have impairments as to his thinking and concentration in judgment activities; and had cervical stenosis consistent with his age. (*Id.* at 234–36.)

On April 4, 2003, Dr. Book stated in a letter to Plaintiff's attorney that Plaintiff does not hear well; has degenerative joint disease exacerbated by increased movement; has degenerative disc disease in his cervical spine; was limited to a maximum lift of five pounds at any one time;

and was limited to working below his shoulder level, with repetitive motions of not more than one pound ten times per hour. (*Id.* at 231.)

2.  *Procedural History*

Plaintiff filed an application for disability insurance benefits on July 23, 2001. (*Id.* at 13, 25.) The social security administration denied Plaintiff's application on March 25, 2002. (*Id.* at 26–30.) On April 11, 2002, Plaintiff requested a hearing before an ALJ. (*Id.* at 22.) The ALJ held a hearing on April 8, 2003, at which Plaintiff and vocational expert Martin Rauer testified. (*Id.* at 22, 264–90.) Plaintiff testified that he could read a newspaper, albeit slowly. (*Id.* at 268.) Plaintiff testified that he underwent two surgeries on his left shoulder. (*Id.* at 272.) Plaintiff said that the first surgery was successful, and his doctor allowed him to return to work. (*Id.* at 272–73.) Plaintiff stated that he subsequently re-injured his shoulder, and underwent a second surgery. (*Id.* at 273.) Plaintiff said that he still feels pain in his left shoulder every day, has difficulty and experiences pain upon lifting anything, and takes medication daily to alleviate the pain. (*Id.* at 274, 277.) Plaintiff testified that he is depressed, and "about every day," he confines himself at home, sits in a shed behind his house, and does nothing. (*Id.* at 275–76, 279–80.) Plaintiff stated that sometimes he stays in bed all day, and has had thoughts of harming himself on several occasions. (*Id.* at 280.)

The vocational expert testified that: (1) Plaintiff was borderline literate, (2) Plaintiff was a municipal maintenance worker in the vocationally relevant past, and (3) the job, as Plaintiff performed it, had an exertional level of heavy and was a skilled position. (*Id.* at 285, 287.) The ALJ set forth a hypothetical to the vocational expert involving an individual with very similar limitations to those outlined in the residual functional capacity ("RFC") below. (*Id.* at 286.) In

response, the vocational expert testified that an individual with that RFC could not perform the Plaintiff's former job of municipal maintenance worker, but could perform at least three jobs: dealer account investigator, furniture rental consultant, or gate guard. (*Id.*) The vocational expert stated that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (*Id.*) The ALJ then set forth a second hypothetical to the vocational expert, contemplating an individual with limitations similar to the RFC below and with the additional limitation of only occasional interaction with the public. (*Id.*) The vocational expert responded that the additional limitation would have less than a five percent effect on the incidence of dealer account investigator, but would exclude furniture rental consultant and gate guard. (*Id.* at 286–87.) The vocational expert testified that an individual with the limitations of the second hypothetical, with an additional limitation of needing to isolate himself on an unpredictable basis for an unpredictable period of time would not be compatible with competitive employment. (*Id.* at 287.)

On June 19, 2003, the ALJ issued his decision in which he determined that Plaintiff was not disabled within the meaning of the Social Security Act at any point up until March 14, 2003, Plaintiff's fifty-fifth birthday, when Plaintiff became presumptively disabled due to his age. (*Id.* at 19–20.) The ALJ determined that prior to March 14, 2003, Plaintiff retained the RFC to perform light work subject to restrictions including: lifting and carrying up to twenty pounds occasionally and ten pounds frequently; sitting, standing, or walking about six hours during an eight hour workday; no work above chest level; no repetitive extended-arm reaching; no pushing or pulling; and no constant, assembly-line type usage of the non-dominant upper extremity. (*Id.* at 18.)

In reaching his conclusion, the ALJ found that although Plaintiff claimed that he became disabled on November 7, 2000, Plaintiff continued to work and earn wages through February 27, 2001. (*Id.* at 14.) The ALJ thus found that Plaintiff had not engaged in substantial gainful activity since February 27, 2001. (*Id.*) Next, the ALJ found that Plaintiff had medically determinable, severe impairments in the form of a torn right rotator cuff, a torn biceps tendon, and degenerative disc disease of the cervical spine. (*Id.* at 15.) The ALJ found that Plaintiff's depression and hearing and vision loss were not severe impairments. (*Id.* at 16.)

The ALJ found that Plaintiff's impairments, alone and in combination, did not rise to the level of the listings in Appendix 1, Subpart P of Social Security Regulations No. 4. (*Id.*) After reviewing the medical evidence and hearing testimony, the ALJ made his RFC determination. (*Id.* at 18.) The ALJ found Plaintiff only partially credible because his alleged limitations were not consistent with his daily activities or with the other information contained within Plaintiff's file. (*Id.* at 17.) Further, the ALJ rejected Dr. Book's conclusions in the April 8, 2002 medical evaluation of Plaintiff because they were internally inconsistent with Dr. Book's other notes and with the record as a whole, and they ignored any residual capacity of Plaintiff's dominant, right extremity. (*Id.*) The ALJ also rejected Dr. Book's medical conclusions from April 4, 2003 as inconsistent with Dr. Book's own records. (*Id.*)

The ALJ determined that prior to March 14, 2003, retained the RFC to perform restricted light work activities:

> "with lifting and/or carrying up to [twenty] pounds occasionally and [ten] pounds frequently; sitting, standing, and/or walking about six hours during an eight hour workday; no over-the-chest level work; no repetitive extended-arm reaching; no pushing or pulling; and no constant (assembly-line type) usage of the non-dominant upper extremity."

(*Id.* at 18.) The ALJ opined that Plaintiff's level of literacy was not pertinent to his decision due to Plaintiff's ability to work at a skilled job for twenty-two years despite any deficiencies in his literacy. (*Id.*) The ALJ also found that transferability of Plaintiff's work skills was not material in view of the contemplation of unskilled work. (*Id.* at 18.) Based on the foregoing considerations and the RFC determination, the ALJ held that prior to March 14, 2003: (1) Plaintiff could not perform his past relevant work as a municipal maintenance worker, (2) Plaintiff was not disabled, and (3) Plaintiff's "occupational base for light work was not significantly eroded by his nonexterional functional limitations." (*Id.* at 18, 19.)

On July 17, 2003, Plaintiff requested a review of the ALJ's decision. (*Id.* at 7.) On August 6, 2004, the appeals council affirmed the ALJ's decision, making it the final administrative decision for the purposes of judicial review. (*Id.* at 4–6.) On August 23, 2004, Plaintiff filed a complaint in this court, challenging the Commissioner's denial of disability and supplemental social security income benefits. (Compl. [filed Aug. 23, 2004].) On December 20, 2004, Plaintiff, through counsel, filed his opening brief. (Pl.'s Opening Br. [filed Dec. 20, 2004] [hereinafter "Pl.'s Br."])

**ANALYSIS**

*1. Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of the Commissioner's denial of disability insurance benefits. *See* 42 U.S.C.A. § 1383(c)(3) (2004) (incorporating review provisions of 42 U.S.C.A. § 405[g]). Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C.A. § 405(g). Thus, this court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision. *See id.*; *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992). The court must uphold the Commissioner's decision if it is supported by substantial evidence. *See Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court cannot reweigh the evidence nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987). That does not mean, however, that my review is merely cursory. To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

### 2. *Evaluation of Disability*

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than sixty-five years of age, and is under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.A. § 1382c(a)(3)(A) (2004). In proving his disability, a claimant must make a *prima facie* showing that he is unable to return to the prior work he has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs which the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis); 20 C.F.R. § 404.1520 (2004). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988); 20 C.F.R. § 404.1520(a). First, the claimant must demonstrate that he is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment

matches or is equivalent to established listings, then the claimant is judged conclusively disabled. 20 C.F.R. § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents him from performing work he has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform his previous work, he is not disabled. *Id.*; 20 C.F.R. § 404.1520(e). The fifth step requires the Commissioner to demonstrate that (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience, and (2) there is availability of that type of work in the national economy. *See Williams*, 844 F.2d at 751; 20 C.F.R. § 404.1520(f).

### 3. *Disability Determination*

Plaintiff sets forth three arguments why he believes the Commissioner erred, and makes two arguments regarding appropriate steps in the case of remand. First, Plaintiff argues that the ALJ erred by failing to find Plaintiff's alleged mental impairments severe. (Pl.'s Br. at 4.) Second, Plaintiff contends that the ALJ erred in determining Plaintiff's RFC. (*Id.*) Third, Plaintiff argues that the ALJ erred in failing to consider Plaintiff's literacy level in assessing Plaintiff's ability to perform work in the economy. (*Id.*) Additionally, Plaintiff argues that if this court decides this case in Plaintiff's favor, the court should grant an immediate award of benefits rather than remand the case for additional proceedings. (*Id.* at 5.) Finally, Plaintiff argues that if this court decides that remand is proper in this case, the case should be remanded to a different ALJ and limited to the period prior to March 14, 2003. (*Id.*) I only address Plaintiff's first three arguments.

### a.     *The ALJ Correctly Assessed Plaintiff's Mental Impairments*

Plaintiff maintains that the ALJ erred by not defining Plaintiff's alleged mental impairments as severe. (*Id* at 4.) Plaintiff argues that he has satisfied the "*de minimus* [sic] burden of showing a severe mental impairment" by presenting: (1) the opinion of Plaintiff's treating psychiatrist Dr. Johnston that Plaintiff's mental impairment was between moderate and extreme in most areas of mental function, (2) the opinion of examining physician Dr. Olson that plaintiff had extreme mental impairment in several areas of social functioning, and (3) Plaintiff's own testimony regarding his psychological symptoms. (Admin. R. at 4.) I address effects of Plaintiff's physicians' opinions and Plaintiff's own testimony below.

#### *1.     Plaintiff's Physicians' Opinions Alone Do Not Establish Severity*

The opinions of Drs. Johnston and Olson that Plaintiff had mental impairments do not, in and of themselves, establish that Plaintiff was severely impaired. "Although step two requires only a '*de minimis*' showing of impairment, a 'claimant must show more than the mere presence of a condition or ailment'" *Eden v. Barnhart*, 109 Fed. Appx. 311, 313 (10th Cir. 2004) (quoting *Hinkle v. Apfel*, 132 F.3d 1349, 1352 [10th Cir. 1997]). Determination of a psychological impairment as "severe" requires showing that the impairment significantly limits the ability to engage in basic work activities. 20 C.F.R. § 404.1521(a) (2005); *Eden*, 109 Fed. Appx. at 315; *Hansen v. Heckler*, 783 F.2d 170, 174 (10th Cir. 1986) (citations omitted) (the severity of an impairment is to be measured by its effect on a claimant's ability to work, not solely by reference to medical standards). "Basic work activities" are defined as:

> the abilities and aptitudes necessary to do most jobs. Examples of these include:
> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

      (2) Capacities for seeing, hearing, and speaking;
      (3) Understanding, carrying out, and remembering simple instructions;
      (4) Use of judgment;
      (5) Responding appropriately to supervision, co-workers and usual work situations; and
      (6) Dealing with changes in a routine work setting.

20 C.F.R. § 416.921(b) (2003). The ALJ gave specific consideration to the interrelation between Plaintiff's alleged mental impairments and Plaintiff's ability to perform basic work activities when the ALJ determined that Plaintiff "has dealt with his depression by going hunting and camping — activities which require multi-tasking, exertion[,] and decision making." (Admin. R. at 275, 16.)

The ALJ also considered Plaintiff's medical and therapeutic treatment in determining the severity of Plaintiff's alleged mental impairments. (Admin. R. at 16.) The ALJ emphasized that Plaintiff had not been hospitalized for his depression and is being treated with counseling and medications to control his anxiety and insomnia. *Id.*; *see Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995) (Impairments that are reasonably alleviated by treatment militate against a determination of total disability.) Notably, Plaintiff himself testified that his depression "comes and goes." (Admin. R. at 278.) Therefore, substantial evidence supports the ALJ's determination that Plaintiff's mental impairment was not severe.

### 2. *Plaintiff's Credibility*

Plaintiff contends that his own testimony suffices to establish the severity of his mental impairments. (Admin. R. at 4.) The ALJ found Plaintiff only partially credible because Plaintiff's activities were not consistent with his alleged limitations. (*Id.* at 17.) Credibility determinations made by an ALJ are generally considered binding upon review. *Gossett v. Bowen*,

962 F.2d 802, 807 (10th Cir. 1988.) The record shows that in May 2001, Plaintiff reported that he could push a lawnmower without much pain in his shoulder, but in October 2001, Plaintiff reported that all of his activities were "very restricted to almost nothing" from the time of his accident. (Admin. R. at 135.) In September 2001 Plaintiff was advised by Dr. Book to refrain from working, including light duties at home, but in December 2001, Plaintiff reported that he was hunting and shooting. (Admin. R. at 121, 122.) These inconsistencies serve as substantial evidence to support the ALJ's assessment of Plaintiff's credibility. The ALJ correctly found that Plaintiff was not fully credible, and therefore the ALJ correctly did not rely on Plaintiff's testimony to establish the severity of Plaintiff's alleged mental impairments. In accordance with the analysis above, the ALJ's determination at step two is supported by substantial evidence.

    *b.*    *Plaintiff's RFC*

Plaintiff contends that the ALJ's decision was not supported by substantial evidence in determining Plaintiff's RFC because the ALJ relied on the report of a state agency disability examiner, a non-physician, rather than a treating physician's medical expert opinion. (*Id.* at 11-13.) As a preliminary matter, the ALJ is permitted to reject entirely the opinion of a treating physician, so long as the ALJ provides specific, legitimate reasons for that rejection. *King v. Barnhart*, 114 Fed. Appx. 968, 970 (10th Cir. 2004). In this case, the ALJ assigned no weight to Dr. Book's opinions from April 8, 2002 and April 4, 2003 because the opinions are inconsistent with Dr. Book's own notes as well as with the record as a whole. (Admin. R. at 17.) The ALJ gives the specific and legitimate reason of inconsistency, but does not state that he rejects all of Dr. Book's opinions, merely the two from April 8, 2002 and April 4, 2003. (*Id.*)

Moreover, "[t]he record must demonstrate that the ALJ considered all of the evidence." *Clifton v. Chater*, 79 F.3d 1007–10 (10th Cir. 1996). Here, the ALJ expressly avers to examining the entire record in determining Plaintiff's RFC. (Admin. R. at 17.) The ALJ affords substantial weight to the state agency disability examiner's report, as it is consistent with other medical evidence in the record and supported by acceptable clinical laboratory and diagnostic techniques. (*Id.*) Plaintiff argues that a non-medical source cannot administer, apply or interpret such techniques. (Compl. at 12.) Plaintiff's argument is unavailing. The form on which the report is printed directs the examiner to "cite specific clinical and laboratory findings, [and] observations" in describing the evidence supporting the examiner's conclusions. (Admin. R. at 111.) Further, the disability examiner's report is consistent with at least: (1) Dr. Weinstein's March 2001, May 2001 and June 2001 reports, and (2) and Dr. Book's May 2001 and June 2001 reports, which all limit Plaintiff's repetitive and overhead activities and impose a twenty or twenty-five pound weight-lifting restriction. (*Id.* at 130–37, 140). Accordingly, the ALJ's RFC determination is supported by substantial evidence in the record.

    *c.*    ***Plaintiff's Literacy***

Plaintiff argues that the ALJ erred in finding that Plaintiff's literacy was not pertinent to his decision. Plaintiff argues that it was "clearly error for the [ALJ] to ignore Plaintiff's limited literacy in the analysis of what jobs Plaintiff was capable of performing." (Pl.'s Br. at 14.) Plaintiff bases this argument on the "common sense" notion that the three jobs the ALJ found Plaintiff capable of performing "probably require a good reading ability," and on the requisite language development levels outlined in the DOT to perform these jobs. (*Id.*) Plaintiff states that two of the three jobs require DOT language development level two capability and one

requires level four capability, and explains the various reading and writing tasks a person must be able to complete to qualify at level two or level four. (*Id.*) Plaintiff makes no argument as to which language development level he is classified under.

Plaintiff also refers the court to *Eggleston v. Bowen*, 851 F.2d 1244 (10th Cir. 1988) in support of his contention that illiteracy limits the type of work a person has the capacity to perform. (Pl.'s Br. at 4, 14.) Plaintiff's reliance is misplaced. In the instant case, Plaintiff does not assert that he is illiterate. The Code of Federal Regulations states, "[i]lliteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." 20 C.F.R. § 404.1564 2005. Plaintiff testified that he went to school through the eighth grade and is able to read a newspaper slowly. (Admin. R. at 267–68.) Moreover, the vocational expert testified that Plaintiff is "probably borderline" literate. (Admin. R. at 287.)

Finally, the medical vocational guidelines state "[w]hile illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance." 20 C.F.R Part 404, Appendix 2, 2005.

All three of the jobs that the vocational expert testified Plaintiff could perform were unskilled, because all carried an Specific Vocational Preparation ("SVP") level two and "unskilled work corresponds to an SVP of 1-2." Social Security Ruling 00-4p, 2000 WL 1898704, at *3; (Admin. R. at 286–87.) The ALJ considered evidence that (1) all of the jobs suggested for

Plaintiff are unskilled jobs, and therefore literacy has the least significance as to work function, and (2) Plaintiff is at least "borderline" literate. (Admin. R. at 286–87.) Therefore, the ALJ's decision regarding the pertinence of Plaintiff's literacy is supported by substantial evidence.

### *4.   Conclusion*

Based on the foregoing it is therefore

ORDERED that the Commissioner's decision is AFFIRMED.

Dated this 27th day of September, 2005.

BY THE COURT:

s/Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge